**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

TERRI E. G.,[1]                 )
                                     )
          Petitioner,      )
                                     )
vs.                            )     Civil No.  17-cv-357-CJP[2]
                                     )
COMMISSIONER OF SOCIAL  )
SECURITY,                     )
                                     )
          Respondent.    )

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge**:

In accordance with 42 U.S.C. § 405(g), Plaintiff Terri E. G., represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

### Procedural History

Plaintiff applied for benefits in October 2011 alleging disability beginning in June 2011.  (Tr. 140).  Plaintiff was denied benefits initially and upon reconsideration. (Tr. 86; 90-93).  After a September 2013 evidentiary hearing, she was again denied.  (Tr. 12-35).  Plaintiff exhausted administrative remedies and filed a timely complaint with this Court in 2015, *Terri E. G. v. Colvin*, 15-CV-723-CJP.  (Tr. 1139-42).  Upon the parties' agreed motion for remand, this Court reversed and remanded the case back to the Social Security Administration for a

---

[1] In keeping with the Court's recently adopted practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns.  See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This matter was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 30.

new hearing. (Tr. 1153-54). Following remand, Plaintiff was given a second hearing in November 2016 before Administrative Law Judge (ALJ) Michael Scurry. He denied her application for benefits. (Tr. 1033-57). Plaintiff did not seek review from the Appeals Council, making ALJ Scurry's decision final.[3] Plaintiff filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ failed to follow the law of the case doctrine;
2. The ALJ erred in evaluating Plaintiff's subjective symptoms;
3. The ALJ erred in evaluating opinion evidence;
4. The ALJ erred in considering Plaintiff's obesity; and
5. The ALJ erred in considering third party evidence.

## Applicable Legal Standards

To qualify for DIB benefits, a claimant must be disabled within the meaning of the applicable statutes and regulations. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing

---

[3] See 20 C.F.R. § 404.984 (authorizing a claimant to bypass Appeals Council review when case was previously remanded from a federal court). *See Murphy v. Berryhill*, 727 F.App'x 202 (7th Cir. 2018).

significant physical or mental activities, and that is done for pay or profit.  20

C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals

has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is

presently unemployed; (2) whether the claimant has an impairment or

combination of impairments that is serious; (3) whether the impairments meet or

equal one of the listed impairments acknowledged to be conclusively disabling; (4)

whether the claimant can perform past relevant work; and (5) whether the

claimant is capable of performing any work within the economy, given his or her

age, education and work experience.  20 C.F.R. § 404.1520; *Simila v. Astrue*, 573

F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th

Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is

deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

ALJ Scurry followed the five-step analytical framework described above. He determined Plaintiff was insured through December 31, 2016, and that Plaintiff had not engaged in substantial gainful activity (SGA) since June 2011. The ALJ found Plaintiff's severe impairments included fibromyalgia, history of lupus, seronegative non-erosive rheumatoid arthritis, non-insulin dependent diabetes mellitus with neuropathy, hypertension, history of syncopal episodes, status post coronary artery bypass graft, obstructive sleep apnea, restless leg syndrome, osteoarthritis, bursitis, and obesity. (Tr. 1038-39). ALJ Scurry determined that none of Plaintiff's impairments met or equaled the severity of a listed impairment. (Tr. 1141).

ALJ Scurry found Plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level until July 11, 2016. After that date, Plaintiff had the RFC to perform sedentary work. The sole non-exertional limitation, both before and after July 2016, was that Plaintiff must avoid concentrated exposure to unprotected heights. (Tr. 1042). At step four, the ALJ determined Plaintiff was capable of performing her past relevant work as a library director; therefore, she was not disabled. (Tr.1056-57).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by Plaintiff and is confined to the relevant time period.

### 1. Agency Forms

Plaintiff was born in February 1960, and was fifty-one years old in June 2011 at the time of her alleged onset date.  (Tr. 140).  Before the alleged onset date, she completed three years of college, worked as a library director, and ran her own yarn business.  (Tr. 167; 181).  She said fibromyalgia, lupus, diabetes, depression, sleep apnea, restless leg syndrome, arthritis, iron deficiency, vitamin D deficiency, and a heart condition all limited her ability to work.

Although she reported that she believed her conditions became severe enough to keep her from working as early as January 2010, Plaintiff said she did not quit working until June 2011.  She explained that she stopped working then because of her conditions and for other reasons, which included being fired from her position as a library director.[4]  (Tr. 166).  Around this time she also significantly reduced the operation of her yarn business, citing multiple hospitalizations in July 2011.  Thereafter, Plaintiff decreased her involvement with her yarn business; it closed in 2012.  (Tr. 181).

In November 2011, Plaintiff was five feet seven inches tall and weighed two hundred thirteen pounds.  (Tr. 166).  She took numerous medications to treat her conditions.  (Tr. 169).  During the relevant time period, Plaintiff indicated she

---

[4] Plaintiff reported being fired for embezzlement of library funds. (Tr. 403-06). She was criminally charged, convicted, and sentenced. (Tr. 873-74).

sought treatment for her conditions from several providers, including emergency treatment, and that she had future appointments scheduled. (Tr. 170-78).

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the November 2016 hearing. Plaintiff and a VE, Matthew Sprong, were both sworn and testified under oath. (Tr. 1065-1107).

Plaintiff testified she experiences pain and stiffness and has constant issues with different parts of her body. Her rheumatoid arthritis limits her use of her arms, legs, knees, and feet. She also has an autoimmune disease that compounds her conditions with additional symptoms. (Tr.1084-85).

Plaintiff described the location of her pain and what it feels like. She described pain that originates in her neck and radiates to her shoulders, elbows, wrists, and hands; her pain is more severe on the right side of her body. Further, she has sciatic nerve pain in her right hip; arthritis in her knees, ankles, and toes bilaterally; and she experiences numbness in her toes that extends back to her ankles. (Tr. 1088-89).

Then, Plaintiff discussed her other symptoms related to her fibromyalgia. She explained she has irritable bowel problems causing constant diarrhea approximately four days per week, intermittent dizziness, and vertigo. (Tr. 1090-91).

Plaintiff further explained that her pain affects her ability to concentrate on tasks and remember. She specifically said that when she volunteered at her cousin's newspaper, her pain made it hard to concentrate. She attributed her

memory problems to her autoimmune disease and fibromyalgia. (Tr. 1093). Plaintiff reads approximately one hour per day, but not for a continuous hour because of her attention issues and her inability to sit in one position for long. (Tr.1094-95). She said she often forgets what she reads and what people tell her. (Tr. 1093).

Additionally, Plaintiff testified she is depressed and has been for several years. She takes Lexapro. Despite attending therapy in the past and taking medication, Plaintiff explained it is "very depressing when you can't do what you want to do." She said she feels "sad, hopeless, [and] frustrate[ed]" with her situation, and wonders "if it's worth going on like this." She also takes medication for anxiety. It helps, but she still experiences anxiety attacks "once every couple of months." (Tr. 1094).

Furthermore, Plaintiff suffers from several adverse side effects as a result of her numerous medications. Remicade injections make her sick afterwards with flu-like symptoms. Lexapro causes mouth dryness, weight gain, and dizziness. Klonopin, also referred to as clonazepam, "knocks [her] out," but she acknowledged that it is prescribed as a sleep aid. Her muscle relaxants "are very mind altering." Moreover, Plaintiff takes some medications solely to counter the adverse side effects from her primary medications. For example, she takes folic acid to prevent mouth ulcers caused by her methotrexate medication, which she takes for her rheumatoid arthritis. (Tr. 1095).

Then, Plaintiff explained her physical abilities have deteriorated. She began using a cane in 2015 because her rheumatoid arthritis and osteoarthritis have

made her knees "really bad." She receives treatment, including cortisone injections and takes other medications, and because she has not had great success with these treatments so far, she and her provider began discussions about other treatment options, such as full replacement of her knee joints. (Tr. 1096).

Plaintiff also informed that her symptoms have resulted in other physical limitations. She enjoyed knitting, but no longer does so because the pain in her hands, elbows, and shoulders lasts several days afterwards making the activity no longer "worth it." She explained other activities that require the use of her hands and arms also leave her in the same type of pain.

Additionally, she requires thirty minute breaks every hour or two when sitting as she becomes very stiff, sometimes so stiff she cannot walk. Adding more difficulties, Plaintiff can only walk about five to ten minutes really slowly before needing to stop. Between her sitting and standing troubles, she said, "...it's very hard to decide when and how to move to try to keep myself going." She added that she also physically struggles with transitioning from a sitting to standing position, and she spends five to six hours per day lying down or reclined with her knees elevated. (Tr. 1098). Plaintiff cannot carry or lift anything over five pounds or so. Her arms are not strong and it hurts a lot to try to carry something; she drops things when she attempts to lift or carry. (Tr.1097).

Last, the ALJ called VE Sprong to testify. The VE classified Plaintiff's past library director position as sedentary work under the DOT, but as medium work as Plaintiff actually performed it. VE Sprong based his conclusion on Plaintiff's

report admitted as exhibit 2E. ALJ Scurry posed three progressively restrictive hypotheticals to the VE. The first two hypotheticals mirrored his ultimate RFC finding. VE Sprong testified that the individual in both the first and second hypothetical questions could perform Plaintiff's past work, library director, but only as it is generally performed in the national economy. (Tr. 1102-03). The final hypothetical included sedentary work, but had several more physical and mental limitations than what ALJ Scurry ultimately found. (Tr. 1103-04). Upon Plaintiff's counsel's question, VE Sprong testified that Plaintiff's past work as a library director would require frequent reaching, handling, and fingering. (Tr. 1105).

### 3. Medical Evidence

Plaintiff's medical history and records are extremely lengthy and dense. The records indicate Plaintiff suffers from several conditions that at times intertwine and overlap. Of most relevance are Plaintiff's impairments of rheumatoid arthritis, fibromyalgia, obstructive sleep apnea (OSA), restless leg syndrome (RLS), and diabetes mellitus. For context, the Court starts with Plaintiff's first record and provides a mostly chronological summary, except to address impairments singly in order to clearly show its progression.

In early July 2011, Plaintiff presented at the Washington University sleep center for a review of her OSA, restless leg syndrome (RLS), and insomnia. The visit note indicated Plaintiff has been treated for OSA since 2005. A majority of this visit was consumed by Plaintiff disclosing her fifteen-year tenure as a library director was terminated approximately one week prior because of missing funds.

It was noted Plaintiff was taking two dopamine agonists, Requip and Mirapex, for her RLS, and that both medications are known to have side effects that include compulsive behavior. Darla Darby, M.D., expressly noted that Plaintiff had denied experiencing side effects and compulsive behaviors since starting Mirapex in 2007 and Requip in 2009. Plaintiff further disclosed significantly increasing her daily Mirapex dosage on her own initiative in an attempt to reduce her adverse RLS symptoms; Plaintiff reported better symptom control with the increased dose. Plaintiff explained that her compulsive behaviors at work began around January 2010, but that she was afraid to disclose her compulsive behaviors with Mirapex and Requip because she thought those medications would be discontinued from her treatment plan and would result in her suffering from severe rebound RLS symptoms. Since being fired, Plaintiff reported awakening over ten times per night and awakening unrefreshed in the morning. Consequently, Plaintiff's treatment plan included immediately discontinuing Mirapex, and weaning off Requip to ultimately discontinue it. Lyrica and clonazepam were prescribed as replacements. (Tr. 403-06).

Now, turning to Plaintiff's rheumatoid arthritis and fibromyalgia, the record is abundant with similar symptoms and pain-related complaints throughout the relevant time period. Plaintiff's commonly reported symptoms and pain-related complaints included: diffuse joint discomfort (Tr. 536; 886; 889; 719-20; 1520-22; 1369; 1373; 1507; 1380; 1414-15; 1383; 1445; 1513-15; 1323; 1502; 1495; 1497; 1419; 1422; 1376-82); stiffness (Tr. 886; 889; 1495; 1500; 1504; 1507; 1519; 1513-15; 1523); pain and swelling of her hands and wrists (886; 889; 879;

1504; 1500; 1495; 1523; 1507; 1497; 1525); shoulder pain and discomfort (Tr. 1507; 1513-1517); and fatigue (Tr. 536; 892-95; 719-20; 869; 841; 1527; 1413; 1409; 1446; 1442; 1438; 1430; 1422; 1414-15; 1409).

In late 2011, Plaintiff reported hip pain caused by bursitis. (Tr. 651-53). She also reported fatigue, diffuse joint discomfort, stiffness, and muscle complaints. (Tr. 536). When she saw her rheumatologist in early 2012, it was noted Plaintiff was tolerating her current medications. However, she reported recurrent bursitis pain in her right hip, and that she had occasional "bad days." Plaintiff received a hip injection for her bursitis pain. (Tr. 915; 919).

By August 2012, Plaintiff's rheumatoid arthritis had flared a number of times since she last saw her rheumatologist, Alfred Kim, M.D., in January 2012. She was experiencing pain and swelling of her hands and feet. She still had residual symptoms in her feet and morning stiffness. She reported that engaging in activity resulted in increased pain. Upon examination, Plaintiff's hand was swollen, and synovitis was present in her right hand and wrist. Dr. Kim prescribed a trial period of prednisone. (Tr. 886; 889).

Plaintiff's fibromyalgia was active in January 2013. She told Dr. Kim that her pain had increased. At this time, Plaintiff had bilateral bursitis hip pain; wrist joint pain; and numbness in her third finger on her left hand. (Tr. 879). Approximately two months later, Plaintiff met with a dietician after requesting a referral because her weight reached two hundred and forty pounds. (Tr. 721-22; 713). Plaintiff lost about five pounds in the first week, but not long after, the dietitian opined that Plaintiff's ability to engage in physical activity was limited

because of chronic pain associated with her fibromyalgia, rheumatoid arthritis, and other impairments like, OSA and RLS. (Tr. 713).

Her persistent pain intensified and her poor sleep quality had increased around the middle of 2013. In June 2013, she reported that her arthritis was causing her problems. Upon examination, her right knee joint was swollen, and her cranial nerves extending into her neck were enlarged and tender. (Tr. 719-20). A few weeks later Plaintiff saw her rheumatologist, Dr. Kim, and she reported experiencing persistent and increasingly worse fibromyalgia pain as well as unrefreshing sleep despite taking Lyrica, Aleve, and nighttime Flexeril. Dr. Kim opined that her increase in pain resulted in her poor sleep quality, which was possibly causing enhanced rheumatoid arthritis symptoms. He urged Plaintiff to seek further recommendations from her physicians at the Washington University sleep center. (Tr. 869).

Plaintiff complied with Dr. Kim's instruction, and had an appointment at the sleep center just days later. Like her other reports, she explained that she concurrently began experiencing increased joint and muscle pain when her daytime sleepiness and functioning worsened. She reported that her pain and these symptoms had persisted for approximately two months, beginning around May 2013. Her physician noted that Plaintiff's symptoms persisted despite her compliance with her treatment regimen consisting of Lyrica, clonazepam, and use of a CPAP machine. (Tr. 860).

Unfortunately, by mid-August 2013, Plaintiff's daytime sleepiness and fatigue had persisted without improvement, and her rheumatoid arthritis troubles

had not just persisted, they increased. Her methotrexate, Plaquenil, Voltaren Gel, and Aleve were no longer effective in alleviating her symptoms and pain. (Tr. 841; 717-18). Plaintiff consistently reported that her decline suddenly began approximately three months prior, around May 2013. (Tr. 841). Interestingly, it was documented that Plaintiff was working part-time, two-to-four days per week, at her cousin's newspaper. (Tr. 838).

In January 2014, Plaintiff returned to the Washington University sleep center for a follow-up visit. Her fibromyalgia was noted as improved with daily Lyrica and Flexeril. However, Plaintiff's severe fatigue persisted despite her CPAP compliance. Based on examination findings, her rheumatoid arthritis treatment regimen received a dosage increase to a current medication and the addition of a new medication. (Tr. 1527).

By early August 2014, Plaintiff's right knee pain recurred; inflammation was apparent as it was warm and swollen with an increase of fluid present in the joint cavity. (Tr. 1520). Plaintiff reported that Enbrel injections for her rheumatoid arthritis had helped reduce her morning stiffness over the last two months. However, she reported experiencing adverse injection site reactions; she had severe pain and a knot that formed at the injection site. (Tr. 1519). Rheumatologist Kyle Sinclair, M.D. discontinued Plaintiff's Enbrel and ordered Humira as its replacement. (Tr. 1521-22). As a result of Plaintiff's inflamed right knee joint, Dr. Sinclair performed an arthrocentesis of her knee joint and sent the collected fluid for analysis. Dr. Sinclair assessed that Plaintiff's rheumatoid arthritis and fibromyalgia were of focus along with her long-term use of high-risk

medications.  (Tr. 1521-22).

Also during August 2014, Plaintiff saw Rachel Darken, M.D. at the sleep center.  Her daytime sleepiness had only marginally improved over the last six months; her sleepiness levels were still considered abnormally high.  (Tr. 1442). Given her knee issues, Dr. Darken opined it was best to evaluate Plaintiff at her next visit to consider neurological imaging or possibly increasing Plaintiff's clonazepam dosage.  (Tr. 1445).

Furthermore, in September 2014, Plaintiff presented to an emergency room with right sciatic pain without trauma reportedly lasting for about three weeks. She described her pain as shooting down from her back to her leg and extending all of the way down to the bottom of her foot.  She said the pain felt like a burning sensation.  She also reported having similar episodes in the past, and that steroid injections relieved her pain.  The emergency room physician, Lihua Du, M.D., opined that her sciatica pain was likely secondary to degenerative joint disease. Dr. Du increased Plaintiff's Lyrica dosage.  (Tr. 1369).

After starting Humira approximately two months earlier, Plaintiff visited a hospital again in October 2014.  She went to Fayette County Hospital with complaints of migraine headaches.  She was prescribed Imitrex and was instructed to inform her rheumatologist that she began experiencing headaches upon starting Humira, which is a biologic.  (Tr. 1365).  By November 2014, Plaintiff's Humira was discontinued because of her headaches.  She switched to Simponi, and Dr. Sinclair noted possibly switching her to Orencia at her next visit if her rheumatoid arthritis did not improve with Simponi.  (Tr. 1517).

Plaintiff saw Dr. Sinclair in February 2015. Plaintiff had mixed reports of improvement and worsening while trying Simponi for her rheumatoid arthritis. However, Plaintiff described experiencing persistent all-day stiffness, difficulty opening jars, knee pain so intense it keeps her from exercising, and pain and discomfort in her shoulders. Plaintiff also exhibited raised erythematous bumps visible at the base of her neck near her hairline. Dr. Sinclair discontinued Plaintiff's Simponi and replaced it with Orencia. (Tr. 1513-15).

Plaintiff's knee pain persisted into March 2015. She saw James B. Sola, M.D., with complaints of intermittent right knee pain that had persisted over the past several months. Then, she reported that a week prior to this visit she fell when she felt a sharp increase of pain as she was ascending steps. Plaintiff described her pain as more towards the medial aspect of her knee. (Tr. 1373). She could not put pressure on her right leg for several days. (Tr. 1361). A MRI demonstrated a tear to her medial meniscus in her right knee, and upon examination, her knee was tender to the medial joint line and there was small effusion in the knee joint. Despite her knee ailments, Dr. Sola noted that Plaintiff had no instability to either knee. However, Dr. Sola did note that Plaintiff had minor degenerative changes in her right knee. After considering Plaintiff's rheumatoid arthritis history as a possible cause of her pain, and discussing Plaintiff's treatment options of injections versus knee surgery, Plaintiff informed Dr. Sola that she wanted to pursue surgery with the hope that surgery would result in more definitive relief for her knee pain. (Tr. 1373).

Plaintiff underwent knee surgery on May 5, 2015; there were no

complications. Dr. Sola confirmed a tear of the posterior horn of the medial meniscus in her right knee. (Tr. 1323). Approximately three weeks later, Plaintiff followed up with Dr. Sola. Her knee was still causing her discomfort. Dr. Sola noted Plaintiff's portals looked good and she had full extension of her knee. He prescribed a Medrol Dosepak and an anti-inflammatory medication. (Tr. 1376).

By mid-June 2015, Plaintiff returned to Dr. Sola. Her portals looked good, she had full extension, and she said her knee was feeling much better. However, small effusion was present and Dr. Sola noted Plaintiff did have some degenerative changes. He instructed Plaintiff that he wanted to see her again if her right knee flared back up so he could administer another cortisone injection. (Tr. 1377).

Also in June, Plaintiff saw her rheumatologist and reported significant diarrhea in addition to her persistent joint pain, stiffness, and sore wrists, knees, elbows, and shoulders. Plaintiff reported back pain and her recent knee surgery. (Tr. 1507). Plaintiff's rheumatoid arthritis was not improving with Orencia, and Dr. Sinclair made a note to reevaluate Orencia's effectiveness on Plaintiff's symptoms at the next visit. Dr. Sinclair would determine then whether Plaintiff should try a different rheumatoid arthritis medication. (Tr. 1508; 1510).

Then in August 2015, Plaintiff returned to Dr. Sola. She reported persistent discomfort in her right knee. Plaintiff was unable to fully extend her knee and it was tender to the medial joint line. Dr. Sola assessed Plaintiff with degenerative arthritis and noted degenerative changes in her knee. Plaintiff received a cortisone injection, and Dr. Sola ordered repeat radiographs for her

next visit. (Tr. 1378). Also during August, Plaintiff reported she had been experiencing a loss of sensation in her toes in the evening, and that she sometimes experienced burning pain in the morning. (Tr. 1434). She exhibited mild distal sensory loss upon examination. (Tr. 1437).

When Plaintiff returned to her rheumatologist, Dr. Sinclair, in September 2015, he noted Plaintiff's fibromyalgia was stable with Lyrica and Flexeril. (Tr. 1507). However, he noted that Plaintiff's rheumatoid arthritis was not; she reported that her morning stiffness and hand pain persisted despite taking Orencia. (Tr. 1504). Dr. Sinclair found that all five of the rheumatoid arthritis medications she tried were either ineffective, caused adverse reactions, or did not provide complete control of her disorder. Yet, Dr. Sinclair wanted to wait a little longer before deciding whether Plaintiff should switch from Orencia to a different medication. (Tr. 1507).

In January 2016, Plaintiff told Dr. Sinclair she was feeling worse overall. In fact, Plaintiff contacted his office before this appointment to ask that her Orencia be discontinued and replaced. Unfortunately, insurance authorization issues prevented her from obtaining the replacement medication before this visit. While taking Orencia, Plaintiff's morning stiffness along with her hand pain and swelling persisted. Additionally, she now reported becoming stiff during the day with most of her pain occurring at the end of the day. Furthermore, both of her wrists were bothering her, and her "intermittent" knee pain had become so severe that at times she was unable to walk. (Tr. 1500). Plaintiff's Orencia was discontinued and replaced with Remicade injections. She was encouraged to start exercising.

(Tr. 1502).

Two months later, Plaintiff returned to the sleep center in March 2016. She met with Dr. Darken, who noted Plaintiff's abnormally high sleepiness levels persisted and her weight had increased. Plaintiff thought her newly prescribed Remicade injections might be contributing to her weight gain. Plaintiff added that she was limited from using her home treadmill because of her rheumatoid arthritis discomfort. (Tr. 1429). Last, Plaintiff reported that her sensory loss in her toes with intermittent burning pain had become increasingly frequent over the last six months or so. (Tr. 1430). Dr. Darken opined Plaintiff's rheumatoid arthritis, diabetes, and vitamin B12 deficiency could be related to Plaintiff's sensory loss. (Tr. 1432).

Plaintiff returned to her rheumatologist in April 2016. She reported her stiffness, bilateral hand pain with swelling, and knee pain had persisted without improvement. She also reported persistent numbness and tingling with sharp shooting pains throughout her body despite taking Lyrica. Plaintiff also said that the torn meniscus in her right knee that she sustained over a year earlier was preventing her from regularly exercising. (Tr. 1495). Upon examination, Plaintiff exhibited bilateral tenderness to her wrists and paraspinal muscles. Both crepitus and tenderness were observed in her right knee. (Tr. 1497). The rheumatologist noted that Plaintiff did not have great improvement with her rheumatoid arthritis symptoms after switching to Remicade; the new plan was to increase her Remicade dose and monitor Plaintiff for improvements as well as refer Plaintiff to a pain clinic for her fibromyalgia. (Tr. 1498-99).

Plaintiff saw Dr. Sola in May 2016, approximately one year after her right knee surgery and approximately fourteen months after her right knee injury. Plaintiff again reported persistent discomfort in her right knee. She lacked full extension and her knee was tender to the medial joint line. Plaintiff received another cortisone injection and was instructed to return as needed. (Tr. 1379).

After being referred by her rheumatologist in May 2016, Plaintiff was able to meet with Lesley Rao, M.D., at the Washington University Pain Management Center that June. Dr. Rao noted Plaintiff's strength was four-out-of-five throughout and that she had numbness in her feet bilaterally. After assessing Plaintiff's condition, she prescribed Baclofen to address the neuropathic, spastic component of Plaintiff's pain. Dr. Rao planned to make a physical therapy referral so Plaintiff's pain could be evaluated and a treatment plan could be devised. (Tr. 1427).

Then, on July 12, 2016, Plaintiff returned to Dr. Sola, but this time with complaints of discomfort in her left knee for nearly a month. Her left knee was tender to the medial joint line and moderate effusion was present in the knee joint. A McMurray's examination appeared positive, and the radiographs showed possible degenerative changes. Dr. Sola ordered a MRI to determine if she had a meniscal tear. (Tr. 1380). When Plaintiff returned two weeks later, her left knee discomfort persisted. Dr. Sola noted Plaintiff's MRI showed degenerative changes, but no meniscal tear. Dr. Sola opined Plaintiff's symptoms were related to an arthritis flare-up. Plaintiff underwent a cortisone injection to her left knee. (Tr. 1381).

Plaintiff told Dr. Sola during a follow-up visit in August 2016 that the cortisone injection only helped alleviate her knee discomfort for about two weeks. Dr. Sola opined that Plaintiff's best treatment options included continuing with cortisone injections or viscosupplementation because he did not believe an arthroscopy would be very successful long-term. (Tr. 1382).

Plaintiff returned to Dr. Rao at the Washington University Pain Management Center for a follow up on September 1, 2016. Plaintiff reported benefit from the newly added Baclofen, but she said that she stopped taking her morning Baclofen dose because it made her sleepy. Plaintiff also complained of bilateral knee pain and difficulty walking because of her worsening rheumatoid arthritis pain. Plaintiff further explained, like she had to Dr. Sola in May 2016, that steroid injections in her knees only resulted in short-term relief. She reported and exhibited limited range of motion with tenderness in her knees bilaterally as well as persistent numbness in her feet bilaterally. (Tr. 1419; 1422). Dr. Rao made a note to consider diagnostic nerve blocks at Plaintiff's next visit, and Dr. Rao decreased Plaintiff's morning Baclofen dosage to help with her sleepiness. (Tr. 1422).

A week later, Plaintiff met with Dr. Darken at the sleep center. Plaintiff told her that her RLS was not any better or any worse. Plaintiff's abnormally high sleepiness levels persisted. Plaintiff also reported no longer working part-time at her cousin's newspaper because of her joint issues. Despite no longer working part-time, Plaintiff reported invariably feeling exhausted at the end of each day. Dr. Darken noted that Plaintiff's neuropathy also persisted, and that the location

of her symptoms, which originally presented in her toes, had expanded from Plaintiff's toe region to now include her mid-foot region. (Tr. 1414-15).

Furthermore, Plaintiff's left knee discomfort persisted through late September 2016. Her left knee was tender to the medial joint line, but she did not have gross instability. She had another cortisone injection. Plaintiff wanted to try viscosupplementation if the cortisone injection did not give her long-lasting relief. (Tr. 1383).

Then, about one month before her second evidentiary hearing, Plaintiff told Dr. Rao in October 2016 that she was more concerned about her generalized pain, which she described as burning and aching sensations. Plaintiff reported having a lot of trouble sleeping and presumed recent weather changes were related to her increased general pain. Plaintiff also indicated that she was due for another Remicade infusion to treat her rheumatoid arthritis. (Tr. 1409). Upon examination, Plaintiff exhibited tenderness to her cervical spine, upper extremities, thoracic spine, lumbosacral spine, and lower extremities. (Tr. 1412). Dr. Rao prescribed a nerve pain medication, nortriptyline, to treat Plaintiff's pain and help her sleep. (Tr. 1413).

As to Plaintiff's diabetes mellitus and related neuropathy and pain, in August 2015 Plaintiff reported she had been experiencing loss of sensation in her toes in the evening, and she sometimes noticed burning pain in the morning. (Tr. 1434). It was documented that Plaintiff exhibited mild distal sensory loss. (Tr. 1437). Although her diabetes was noted to be under "good control" (Tr. 1434), Plaintiff was scheduled to undergo laboratory testing for neuropathy. (Tr. 1437).

Plaintiff's symptoms and pain persisted in March 2016. Consistent with her August 2015, she told Dr. Darken in March 2016 that she had been experiencing these symptoms for the last six months or so. (Tr. 1430). Dr. Darken opined that Plaintiff's rheumatoid arthritis and her diabetes mellitus could be related to her sensory loss and the location of her symptoms, which originally presented in her toes, but had now extended to her mid-foot region. (Tr. 1432). Plaintiff's neuropathy persisted in May 2016 and in September 2016, when she reported that the location of her symptoms presented in her toes to and extended to her mid-foot region. (Tr. 1414-15).

Last, although the record does not mention the following medical records in a specific context, Plaintiff had similarly reported symptoms of bilateral foot numbness on a few occasions dating back to November 2011. (Tr. 307-09; 301-02; 414-17). Around one year later, in January 2013, Plaintiff told her rheumatologist that she had been experiencing finger numbness in her left hand. (Tr. 879).

### 4. State Agency Medical Consultants' RFC Assessments

David Mack, M.D., reviewed Plaintiff's file and completed a physical RFC assessment form in December 2011. (Tr. 564-71). Dr. Mack determined Plaintiff's exertional limitations included only occasionally lifting and carrying up to twenty pounds, frequently lifting and carrying up to ten pounds, standing and walking about six hours in an eight-hour work day, sitting about six hours in an eight-hour work day, and the ability to push and pull without limit. (Tr. 565). He assessed that Plaintiff did not have limitations related to posture, manipulation,

vision, and communication. He concluded Plaintiff's only environmental limitation consisted of avoiding concentrated exposure to hazards such as "machinery, heights, etc." (Tr. 566-68).

Dr. Mack based his opinion upon records received dating from August 2010 through November 17, 2011. (Tr. 565-66). He noted Plaintiff's medical history included diagnoses of lupus, non-insulin dependent diabetes mellitus, hypertension, depression, borderline cardiomegaly, post coronary artery bypass graft, sleep apnea, restless leg syndrome, intermittent sleep onset insomnia, carpometacarpal arthrodesis, and osteoarthritis. Dr. Mack said Plaintiff's statements are partially credible regarding lupus, fibromyalgia, sleep apnea, severe depression, restless leg syndrome, diabetes, arthritis, heart condition, and iron and vitamin D deficiencies. He opined Plaintiff was partially credible because although she reported fatigue with activities of daily living and only being able to walk about one block, her gait and range of motion were normal at exams. (Tr. 569). There was no further explanation. (Tr. 564-571).

Four months later in April 2012, C. A. Gotway, M.D., reconsidered Dr. Mack's December 2011 RFC assessment of light work with a slight revision that included noting new evidence was received and considered. Dr. Gotway acknowledged Plaintiff's history of a calcaneal fracture, and the results from several tests and imaging reports. Ultimately, he concluded Dr. Mack's assessment was accurate, and affirmed the RFC assessment of light work. Dr. Gotway did not offer any further explanation. (Tr. 691-93).

Craig Billinghurst, M.D., reviewed Dr. Mack's 2011 RFC assessment in

August 2012. He listed nine of Plaintiff's medical providers, and minimally listed seven examination dates ranging between July 2011 and February 2012. Dr. Billinghurst concluded Plaintiff's statements were partially credible. He included a note that Plaintiff used a cane and passed out regularly, and some of her daily activities. He acknowledged Plaintiff feels her impairments affect her ability to lift, squat, bend, walk, kneel, use her hands, and remember. However, without further explanation, Dr. Billinghurst agreed with Dr. Mack's 2011 RFC of light work. (Tr. 695-97).

### 5. Previous Remand Order

This Court entered a Memorandum and Order to remand this case to the Commissioner in March 2016 upon the parties' joint motion for remand. In relevant part, the order directed that the ALJ assigned would "(1) further evaluate the nature and severity of Plaintiff's fibromyalgia; (2) further evaluate the medical opinion evidence of Dr[]. Kuester []; (3) reassess Plaintiff's residual functional capacity; (4) if warranted, obtain supplemental evidence from a vocational expert; and (5) issue a new decision." This Court noted then that Plaintiff's disability application had been pending for nearly four and one-half years. (Tr.1153-54).

### Analysis

Of Plaintiff's five issues, the Court turns to her second. She argues that ALJ Scurry's subjective symptom analysis is flawed. Plaintiff posits that ALJ Scurry's flawed analysis prevented him from building the requisite accurate and logical bridge from the evidence to his conclusion that Plaintiff's "statements… are not entirely consistent with the medical and other evidence…" (Tr. 1054)

culminating in an RFC determination that was not supported by substantial evidence.

In short, the Court agrees with Plaintiff. ALJ Scurry's reliance upon scarce objective medical evidence in conjunction with his lacking evaluation of the evidence are why the Court must reverse.

In reviewing ALJ Scurry's decision, the Court will read it as a whole. *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("Because it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses…, we consider the ALJ's treatment of the record evidence in support of…his conclusions…") (internal citation omitted). Distinctly, "[t]he ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Therefore, it is only when the ALJ's determination lacks an explanation or support that a reviewing court will declare it to be "'patently wrong,'" and deserving of reversal. *Elder v. Astrue*, 529 F.3d 408, 413–14 (7th Cir. 2008) citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003) (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the symptoms affect her

daily life and her ability to work. See 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. Therefore, the ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence, including the 20 C.F.R. § 404.1529(c)(3) factors. *See* 20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2017 WL 5180304, at * 3.

In determining whether ALJ Scurry's symptom evaluation was proper, the reviewing court's duty is to examine whether an ALJ's subjective symptom determination is reasoned and supported. *See Jens*, 347 F.3d at 213–14; *Powers*, 207 F.3d at 435. The Court will uphold an ALJ's subjective symptom evaluation if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Here, as to medical evidence, ALJ Scurry reduced over five years of Plaintiff's objective medical findings down to two similarly broad and unilluminating characterizations. He only twice mentioned that Plaintiff's "[p]hysical examinations repeatedly show normal breathing and heart rate with mostly full strength and normal range of motion. Gait is normal throughout most of the record." (Tr. 1056; 1055). Then, ALJ Scurry concluded this objective medical evidence "...indicat[ed] that additional limitations are unnecessary." (Tr. 1055).

First, ALJ Scurry was required to explain how Plaintiff's heart, lungs, strength, range of motion, and gait were inconsistent with Plaintiff's statements or other evidence. He provided a robust summary of the medical records (Tr. 1039-

54), but he never provided an analysis explaining how the scarce medical evidence he specifically relied upon supported his conclusion that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were inconsistent with the objective medical evidence. Contrary to the Commissioner's argument, ALJ Scurry's robust recitation of the evidence cannot be considered a proper discussion; "[s]ummarizing the evidence is not the equivalent of providing an analysis of the evidence." *Perry v. Colvin*, 945 F.Supp.2d 949, 965 (N.D. Ill. 2013).

Second, the ability to exhibit normal gait, range of motion, and maintain strength is not inherently inconsistent with her claims of disabling pain related to her fibromyalgia and rheumatoid arthritis. Further, "…[n]o objective test exists for fibromyalgia…" *Holmstrom v. Metro Life Ins. Co.*, 615 F.3d 758, 768–69 (7th Cir. 2010), and "[t]here are no laboratory tests for the presence or severity of fibromyalgia. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996). "The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment." *See Vanprooyen v. Berryhill*, 864 F.3d 567, 568 (7th Cir. 2017).

Based on the above, ALJ Scurry's reliance upon such scarce medical evidence coupled with his lacking explanation are insufficient to support his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)("…failing to explain how the evidence…recited contradicts Plaintiff's allegations constitutes error.").

The Court will now review whether ALJ Scurry's determination that Plaintiff's statements concerning her symptoms "are not entirely consistent with the...other evidence of record" is reasoned and supported by substantial evidence. When the medical evidence does not substantiate a plaintiff's statements about the intensity, persistence, and limiting effects of his or her symptoms, evidence of the following factors must be considered:

(1) The individual's daily activities;
(2) Location, duration, frequency, and intensity of pain or other symptoms;
(3) Precipitating and aggravating factors;
(4) Type, dosage, effectiveness, and side effects of any medication;
(5) Treatment, other than medication, for relief of pain or other symptoms;
(6) Other measures taken to relieve pain or other symptoms; and
(7) Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 404.1529(c)(3); *see also* SSR 16-3p, 2017 WL 5180304, at * 3. *See Thomas v. Colvin*, 745 F.3d 802, 806-07 (7th Cir. 2014); *see Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir.2009); *see also Hearan v. Berryhill*, No. 17 C 0542, 2018 WL 3352657, at *6 (N.D. Ill. July 9, 2018).

Here, ALJ Scurry claims he "...considered the following factors during the relevant period, in accordance with SSR 16-3p."  However, he expressly admits that he only "...considered the [Plaintiff's] activities of daily living, as shown by [her] hearing testimony and the medical records."  He said, "The location, duration, frequency and intensity of the symptoms are taken into account by the [RFC]."  (Tr. 1055).  ALJ Scurry declared that the "record does not warrant any additional limitations[]" because of Plaintiff's "...ability to perform graphic design at a newspaper, complete one hundred hours of community service, tutor grade

school children, care for dogs, and assist customers at her own business." He added, "The [Plaintiff] reports that she enjoys work and that she can make it through an eight-hour day. She repeatedly applies for jobs and works throughout the relevant period, and the only reason she lost her prior job was due to her commission of a felony." (Tr. 1056).

Plaintiff argues ALJ Scurry's conclusion that her statements are inconsistent with the other evidence is not supported by substantial evidence. ALJ Scurry certainly relies on a number of Plaintiff's activities in an effort to support his conclusion that her statements are not consistent with those activities. However, ALJ Scurry improperly relied on these activities while overlooking and misstating evidence. Consistently, ALJ Scurry's explanations are lacking, and to make matters worse, he repeatedly failed to confront evidence contrary to his conclusion and explain why it was rejected. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

For example, ALJ Scurry mentioned several times that Plaintiff tutored grade school children to support his conclusion when discussing her mental and physical impairment-related limitations. (See Tr. 1040; 1055; 1056). However, ALJ Scurry completely neglected to confront Plaintiff's 2016 testimony. Her uncontroverted testimony was that she only tutored grade school children when she was employed by the library. (Tr. 1082). Because Plaintiff's alleged onset date of disability is after her employment at the library was terminated, the tutoring activity pre-dates when she claims disability putting it outside of the relevant time period. Therefore, ALJ Scurry's reliance on an irrelevant activity

without confronting undermining evidence was illogical and improper.

Further, ALJ Scurry similarly mentioned that Plaintiff knitted. (Tr. 1055). However, ALJ Scurry never addressed contradictory evidence that Plaintiff reported as early as 2011 that she limited her knitting until she ultimately had to quit knitting during the relevant time period because she experienced too much joint, shoulder, elbow, and hand pain. (Tr. 73; 105; 195-202; 204; 1516; 1096). Plaintiff even testified in 2016, before ALJ Scurry, that knitting and any type of activity that required the use of her hands and upper extremities left her in pain for several days after engaging in the activity. (Tr. 1096; 1079). Because ALJ Scurry failed to confront this contradictory evidence, and he never explained why it was rejected, it cannot be said that Plaintiff's knitting supports ALJ Scurry's conclusion.

As to Plaintiff's ownership of a yarn store, ALJ Scurry claimed that her duties supported his conclusion that no additional limitations were warranted. (Tr. 1056). However, Plaintiff reported to the agency and directly testified that she significantly reduced the operation of her yarn business around the latter half of 2011 because of hospitalizations and her health. Thereafter, Plaintiff decreased her involvement by delegating most of the operations to her adult daughter until the yarn store closed in 2012. (Tr. 181; 1076). Plaintiff's limited involvement and the 2012 closure of her business occurred incredibly early in the relevant period, yet ALJ Scurry mentioned this piece of evidence as if Plaintiff operated the store throughout most of the relevant period. (See Tr. 1039; 1055; 1056). He failed again to confront and explain why he rejected contrary evidence,

and he never explained how her business ownership until 2012 undermined her statements concerning her impairment-related pain and symptoms. Absent a reasoned and supported conclusion, the Court cannot discern how this shows any inconsistency with Plaintiff's statements concerning the intensity, persistence and limitations of her symptoms, or that additional limitations were unnecessary.

ALJ Scurry also mentioned Plaintiff's other activities such as community service, part-time job applications, and her uncompensated part-time work at her cousin's newspaper. First, ALJ Scurry failed to explain why these activities and the circumstances surrounding these activities were inconsistent with Plaintiff's allegations. Second, he failed to confront and explain why he rejected evidence contrary to his conclusion, including Plaintiff's testimony regarding these activities and her limitations. Finally, ALJ Scurry also misstated some evidence related to these activities.

For example, ALJ Scurry never confronted or discussed Plaintiff's testimony that she had to complete one hundred hours of community service and look for part-time jobs as a part of her criminal sentence after she entered into her 2012 negotiated guilty plea agreement. (Tr. 1080-81; 1084). Further, Plaintiff's community service only took a few hours per day, a couple days a week and she only went when she felt healthy enough. Plaintiff completed her service hours in approximately four months; whereas, the relevant time period here spans over five years. The flexibility Plaintiff had, and small amount of time it required does not seem to comport with the demands of full-time employment. Additionally, Plaintiff testified that her activities mainly consisted of playing games

with and reading to the nursing home residents, and tallying her church's donations and bills. (Tr. 1081). Absent ALJ Scurry's explanation and in light of this evidence, his conclusion is insufficiently supported.

As to Plaintiff's part-time work for her cousin's newspaper, the ALJ again largely ignored Plaintiff's testimony and other evidence, as well as failed to explain how this activity was inconsistent with her allegations. Stunningly, throughout ALJ Scurry's entire decision he only mentioned one portion of Plaintiff's 2016 testimony: "…[Plaintiff] admitted to working for her cousin's newspaper during the hearing. She said she only worked two days per week throughout the employment and only worked half days….from April 2015 until October 2016." (Tr. 1056). In contrast, ALJ Scurry wrote, "Wholly inconsistent with her testimony," is an August 2013 medical examination record that documents Plaintiff was working part-time at her cousin's newspaper. ALJ Scurry said that record says "she was working 2-4 days per week and said they were 7-8 hour days. She ultimately reduced to two days per week, but she continually said that she was able to make it through the day and enjoyed the work." (Tr. 1056). However, ALJ Scurry never explained how the two statements he compared were relevant to his subjective symptom evaluation or her allegations of disabling pain, and he again failed to confront evidence contrary to his conclusion.

For starters, when the adverse credibility finding is premised on inconsistencies between a plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Additionally, SSR 16-3p instructs that subjective

statements made by a plaintiff obtained at a hearing should directly relate to symptoms that plaintiff alleged, and that adjudicators must limit their evaluations to a plaintiff's statements about his or her symptoms and the evidence in the record that is relevant to a plaintiff's impairments. Here, however, the perceived inconsistency between the two statements surrounds how often and when Plaintiff might have started working part-time at the newspaper. Without some type of explanation by ALJ Scurry, this is not a discrepancy that sheds much light on Plaintiff's impairment-related pain or symptoms.

Additionally, as the Seventh Circuit has repeatedly said, "There is a significant difference between being able to work a few hours a week and having the capacity to work full time." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010). *See also Vanprooyen v. Berryhill*, 864 F.3d 567, 571 (7th Cir. 2017)(Part-time work is not good evidence of ability to engage in full-time employment…). Here, Plaintiff explained she was not paid and ALJ Scurry found Plaintiff had not engaged in SGA during the relevant time period. He also never addressed that she reported having difficulties performing some tasks because of her pain. (Tr. 1077-79). Without an explanation, ALJ Scurry's conclusion here is unsupported.

Last, a "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2; *See Krontz v. Berryhill*, No. 1:17-CV-305-PRC, 2018 WL 3738249, at *8 (N.D. Ind. Aug. 7, 2018). Without an explanation by ALJ Scurry, and given his failure to identify supportive evidence, ALJ Scurry appears more concerned with impermissibly

evaluating Plaintiff's overall character or truthfulness than with focusing on whether the intensity and persistence of Plaintiff's symptoms limit her ability to perform work-related activities on a full-time basis.

Finally, it is clear that ALJ Scurry completely ignored abundant evidence related to many of the remaining factors. His failure to consider this evidence is also an error. For example, there is evidence that her symptoms persisted despite her treatment compliance, and that she chose surgery over continuing with less invasive treatment because she wished to achieve more definitive relief from her pain. (Tr. 1373). Further, ALJ Scurry completely failed to discuss ample evidence about Plaintiff's medications, like type, dosage, effectiveness, and side effects and whether this evidence was consistent with her statements and other evidence. During the relevant time period, Plaintiff's rheumatoid arthritis treatment alone endured at least five different medication changes; a number of dosage changes; and some even caused Plaintiff to experience adverse side effects. Yet, ALJ Scurry never discussed whether evidence of these factors was consistent with Plaintiff's statements concerning the nature of her symptoms and pain.

Because ALJ Scurry improperly analyzed evidence and failed to support his reasons with substantial evidence, his subjective symptom determination itself must be considered patently wrong. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). We cannot deem the error harmless, because it impacted several aspects of ALJ Scurry's findings with respect to Plaintiff's RFC, including a finding of greatest consequence here, Plaintiff's ability to perform past relevant work or to adjust to other work. Therefore, this case must be remanded to the

agency for further proceedings. *See Ghiselli v. Colvin*, 837 F.3d 771, 778–79 (7th Cir. 2016).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Terrie E. G.'s application for DIB benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED**.

**DATE:**   **August 28, 2018**

> **s/Clifford J. Proud**
> **CLIFFORD J. PROUD**
> **UNITED STATES MAGISTRATE JUDGE**